UNITED STATES, Appellee

v.

WITOLD WEIMAN and ALEXANDER CZERTOK, Privates, retainers to the camp of the United States Troops without territorial jurisdiction of the United States, U. S. Army, Appellants

3 USCMA 216, 11 CMR 216

No. 1403

Decided August 21, 1953

LT COL George E. Mickel, U. S. Army, 1ST LT Bernard Landman, Jr., U. S. Army, 1ST LT Michael E. McGarvey, U. S. Army, and 1ST LT Wm. S. Maxwell, U. S. Army, for Appellants.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused, Polish nationals, retainers to the camp of U. S. Troops, were tried by general court-martial in France upon charges of larceny of property of the United States and the wrongful sale thereof in violation of Articles 121 and 108, respectively, Uniform Code of Military Justice, 50 USC §§ 715 and 702. Both were found guilty of larceny. Weiman was found guilty, with exceptions not herein important, of wrongful sale. Of this charge, Czertok was acquitted. The former was sentenced to total forfeitures of pay and allowances, and confinement at hard labor for seven years; the latter, to total forfeitures, and confinement at hard labor for four years. The findings and sentences were approved and affirmed by intermediate authorities. We granted their petition for review to de-

**217**

termine whether the court had jurisdiction over them.

The accused were members of the 4128 Labor Service Company, designated as privates, and assigned an identifying serial number.. Weiman was 'a guard at Maginot Caserne, Verdun, France, under American control, and Czertok was employed at the Caserne. Further evidence of their status is available, for, as we declared in United States v. Vincent C. Jones (No. 288), 2 USCMA 80, 6 CMR 80, decided December 17, 1952, we will recognize the existence of facts which do not appear in the record of trial, but which were matters of common knowledge to military personnel at the scene of the court-martial. Official records of the Department of the Army disclose that the 4128 Labor Service Company was recruited in the American Zone of Occupation in Germany, and ultimately brought to France for service with forces of the United States located in that country.

It should be clear that we are here concerned with nationals of a country other than the United States, present in a foreign country friendly to the United States, solely as employees of the military forces of the United States. We are not here concerned with nationals of a host nation, employed by our forces within the borders of such a nation. With this limitation upon the scope of this opinion, we proceed to consider the problem presented.

Jurisdiction of courts-martial over persons is provided for by Article 2 of the Uniform Code of Military Justice, 50 USC § 552. This Article provides, in pertinent part, as follows:

"The following persons are subject to this code:

. . . . . .

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States . . . ."

It is evident that this provision establishes a conditional jurisdiction over the classes of persons referred to. By its terms, persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States, are subject to the jurisdiction of a court-martial, unless the exercise of such authority conflicts with the provisions of a treaty or agreement to which the United States is a party, or to an accepted rule of international law.

At the outset, it should be noted that their status as "aliens" does not exclude them from the provisions of the Code, if other factors bring them within its terms. Historically, as used in other subdivisions of the Article, the term "person" has been held to include "aliens" as well as citizens. Ex parte Dostal, 243 F 664, 671; Ex Parte Beaver, 271 F 493, 495 (DC Ohio). Moreover, service decisions have consistently so held. United States v. Espineli, 2 CMR(AF) 627; United States v. Fernandez and Pantorilla, 12 BR–JC 183, 189. In view of the absence of an indication of any intention to distinguish between citizens and aliens, we conclude that Congress employed the term "persons" in its broadest sense. Consequently, the court-martial did not lack jurisdiction over the accused because they were not citizens of the United States.

That the armed forces of the United States operate beyond our continental limits and possessions is a matter of common knowledge. Our responsibilities in the occupied areas of Europe, our commitments in France, and our obligations in other European countries under the North Atlantic Treaty Organization are brought to our attention daily. Obviously, proper maintenance and support of our far-flung forces require the employment of nationals of countries other than the United States. Congress, in whom vested the authority of raising and supporting armies by Article I, Section 8, of the Constitution, was certainly aware of this requirement. Any doubt which may have existed under Article of War 2, 10 USC § 1473, as to whether such nationals were included in the phrase "all persons accompanying or serving with the armies of the United States," was re-

218

moved by the addition of the phrase "employed by" to Article 2 (11) of the Code, supra. Thereafter, essential to any employment contract, express or implied, was the provision that any person, whether a national of the United States, or of any other country, employed beyond our continental limits or possessions, by the very fact of that employment, became subject to the Uniform Code of Military Justice, unless a treaty to which the United States was a party, or an accepted rule of international law decreed otherwise. Ex parte Dostal, supra, page 671.

Reiterating the premise that we are here concerned only with foreign nationals, present in a country friendly to the United States, solely as employees of our military forces, we consider first whether any accepted principle of international law precludes such jurisdiction.

The right of a nation to exercise authority over its forces while in a friendly foreign nation was early recognized by the United States Supreme Court. In The Schooner Exchange v. M'Faddon and Others, 11 US 116, 3 L ed 287, Chief Justice Marshall, announcing the lack of jurisdiction of American courts over a French warship granted the right of passage in an American harbor, declared:

"In such case, without any express declaration waiving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. By exercising it, the purpose for which the free passage was granted would be defeated, and a portion of the military force of a foreign independent nation would be diverted from those national objects and duties to which it was applicable, and would be withdrawn from the control of the sovereign whose power and whose safety might greatly depend on retaining the exclusive command and disposition of this force. The grant of free passage therefore implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments which the government of his army may require."

In Coleman v. Tennessee, 97 US 509, 515, 24 L ed 1118, the Supreme Court declared:

"It is well settled that a foreign army, permitted to march through a friendly country or to be stationed in it, by permission of its government or sovereign, is exempt from the civil and criminal jurisdiction of the place. The sovereign is understood . . . to cede a portion of his territorial jurisdiction when he allows the troops of a foreign prince to pass through his dominions. . . . ."

The doctrine of these cases has been approved in Dow v. Johnson, 100 US 158, 165, 25 L ed 632; and Tucker v. Alexandroff, 183 US 424, 433, 46 L ed 224, 22 S Ct 195. The decided weight of authority in international law supports this position. King, Jurisdiction Over Friendly Foreign Armed Forces, 36 American Journal of International Law 539; Idem, 40 American Journal of International Law 257; Barton, Foreign Armed Forces, 26 British Year Book of International Law 380.

We conclude, therefore, that no principle of international law prohibits the exercise of jurisdiction over the accused.

There remains then, the problem of determining whether the provisions of any treaty to which the United States is a party prohibits the exercise of jurisdiction over them. We have examined the treaty and agreements existing between the United States and France respecting the presence of American forces in that country. Since these matters are classified as secret security information, we do not set forth their contents in this opinion. Rather than divest the court-martial of jurisdiction over the accused in this instance, these documents disclose that both parties contemplated the exercise of such jurisdiction by the military authorities of the United States. Thus, we must conclude that there was here an affirmative recognition by both parties of the cession of jurisdiction inherent in the

**219**

consent of France to the entrance of our forces.

From the foregoing, we conclude that having voluntarily accepted employment with the armed forces of the United States, the accused were subject to the Uniform Code of Military Justice while in France working for the armed forces. The court-martial, therefore, had jurisdiction.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (concurring in the result):

I concur in the result. Under Article 2 of the Uniform Code of Military Justice, 50 USC § 552, settled principles of international law, and classified material in the hands of the Department of State no other conclusion is possible.